HRSS, INC., et al., Plaintiffs,

v.

**WAYNE COUNTY TREASURER, et al., Defendants.**

No. 02–CV–71937–DT.

United States District Court, E.D. Michigan, Southern Division.

Aug. 28, 2003.

Robert Horvath, Troy, MI, Hugh Davis, Jr., Constitutional Litigation Assoc., P.C., Detroit, MI, for Plaintiffs.

Samuel Nouhan, Wayne County Corporation Counsel, Detroit, MI, for Defendants.

**ORDER DENYING PLAINTIFFS' "MOTION FOR SUMMARY JUDGMENT" AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' "CROSS–MOTION FOR DISMISSAL AND/OR SUMMARY JUDGMENT" AND HOLDING PLAINTIFF'S "MOTION FOR CLASS CERTIFICATION" IN ABEYANCE AND PERMITTING ADDITIONAL LIMITED DISCOVERY AND DIRECTING FURTHER BRIEFING**

CLELAND, District Judge.

On June 16, 2003 Plaintiffs filed two motions: a "Motion for Summary Judgment" and a "Motion for Class Certification." On July 17, 2003, Defendants filed a document entitled "Cross–Motion for Dismissal and/or Summary Judgment," which included Defendants' response to Plaintiffs' motion and a motion for dismissal and/or summary judgment.[1] In lieu of the August 27 hearing originally scheduled on these matters, the court conducted a status conference. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, Plaintiffs' motion for summary judgment will be denied and their motion for class certification will be held in abeyance. Defendants' motion will be granted in part and denied in part.

## I. BACKGROUND

This dispute arises from mortgage foreclosure sales conducted by Wayne County (the "County"), primarily through the County's Sheriff and Treasurer. All have been named as defendants in this suit. The facts in this case are largely undisputed.

On October 27, 1999, Plaintiffs Harold and Joann Holt were involved as the mortgagors in a mortgage foreclosure sale conducted by the County. The property that was foreclosed upon had costs, including an outstanding mortgage, attached to it in the amount of $16,503.55. The property was purchased for $41,000.00 at the mortgage foreclosure sale, leaving an overbid surplus[2] of $24,496.45. State law directs the County to turn any surplus over to the mortgagor unless a claim, or competing claims, to the surplus proceeds are made. *See* Mich. Comp. Laws § 600.3252. If such claims are made, the state circuit court conducts a hearing to determine the proper disposition of the surplus funds.

In this case, Royal Mortgage Corporation, an alleged assignee of Harold and Joann Holt, made a claim to the $24,296.45 surplus. The case was assigned to Chief Wayne County Circuit Judge Michael Sapala, who issued an order on August 15,

---

**1.** Defendants' filing is defective in three respects. First, inasmuch as the document constitutes a response to Plaintiffs' June 16, 2003 motion, it was untimely. *See* E.D. Mich. LR 7.1(d)(1)(B) ("A response to dispositive motion must be filed within 21 days after service of the motion."). Second, Defendants' motion for summary judgment was filed over two weeks beyond the court's June 30, 2003 dispositive motion deadline. Defendants have not sought, nor have they been granted leave, to file these documents beyond the above deadlines. Finally, the submission of a response to a motion that also brings another motion creates confusion on the docket and is inappropriate and prohibited. Despite Defendants' disregard for the court's deadlines and proper filing protocol, the court will give appropriate consideration to Defendants' submission.

**2.** "Overbid surplus" describes any funds that remain after the mortgage has been satisfied through a foreclosure sale.

2000 directing the County to issue the $24,496.45 surplus to the Holts. On August 16, 2000, the Wayne County Clerk's Office issued a check in the amount of $24,496.45 to the Holts, which was retrieved by Joann Holt on September 15, 2000. A period of nearly ten months separated the foreclosure sale and the issuance of the check to the Holts.

Similarly, on August 3, 2000, Defendant Wayne County received an overbid surplus of $52,561.63 from the sale of certain other foreclosed-upon property. Plaintiff HRSS, Inc. ("HRSS") was the assignee for any overbid surpluses resulting from that sale. On October 21, 2000, Defendant Wayne County tendered payment in the amount of $52,561.63 to HRSS.

According to the testimony of Kate Ben–Ami, a staff attorney for the Wayne County Sheriff's Department, before June 1999, the Sheriff's Department managed the overbid surplus funds internally, depositing the money into an account handled by the Sheriff. (Ben–Ami Dep. at 45–47.) On or about June 1, 1999, however, Wayne County's "Director of Cash Management," its Treasurer and its Sheriff (or certain unnamed "personnel" thereof) apparently decided to integrate "the Sheriff Court Services Division's cash into the County general ledger system." (Ex. 5 attached to Ben–Ami Dep.) This integration resulted in the overbid surpluses being pooled into the same account as other governmental revenues, including tax money, transfers from government agencies, and revenues collected by county agencies and facilities, such as golf courses. (Smith Dep. at 10.) This pooled account, the Wayne County Treasurer's general receiving account, was deposited with Bank One.

Plaintiffs claim that once Defendants hold any surplus funds generated from mortgage foreclosure sales in an interest-bearing account, they have a duty to pay over the principal, along with any earned interest, to the mortgagor within a reasonable amount of time. Plaintiffs brought suit alleging violations of federal and state law. They also seek to certify this lawsuit as a class action on behalf of all mortgagors involved in Wayne County foreclosure sales that were not paid interest on their overbid surpluses.

## II. SUMMARY JUDGMENT

### A. Standard

Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment motions, provides in part that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and a summary judgment is to be entered if the evidence is such that a reasonable jury could find only for the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is not necessary for the moving party to support its motion with affidavits or other similar forms of evidence; rather, the movant need only show that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. Therefore, the court must necessarily examine the evidence provided in a light that is most favorable to the non-

moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), and decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *Anderson*, 477 U.S. at 251–252, 106 S.Ct. 2505.

## B. Discussion

### 1. State Tort Claims

■ Plaintiffs assert various state tort claims against Defendants, including conversion, wrongful appropriation, unjust enrichment, and breach of fiduciary duties. Because Defendants are immune from such allegations, these claims will be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted. .

"A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Mich. Comp. Laws § 691.1407(5). The Wayne County Sheriff and Treasurer were acting within the scope of their authority when they held and disbursed funds from foreclosure sales, and thus are immune from tort liability under this statute.

■ Plaintiffs' tort claims against Wayne County also fail as a matter of law because the county is immune under Michigan law. Unless a statutory exception applies, and no exceptions apply in this case, "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." Mich. Comp. Laws § 691.1407(1). For purposes of this section, the term "governmental agency" includes counties. Accordingly,

Wayne County is entitled to immunity for its role in foreclosure sales.

### 2. State Constitutional Claims

■ Plaintiffs' claims brought pursuant to the Michigan Constitution also fail as a matter of law. In *Jones v. Powell*, 462 Mich. 329, 612 N.W.2d 423 (2000), the Michigan Supreme Court held that inasmuch as other avenues of relief are available, there is no "damage remedy for a violation of the Michigan Constitution in an action against a municipality or an individual government employee." *Id.* at 426. As is evident in this case, another avenue of relief is available to obtain damages from the county and its officials, namely an action under 42 U.S.C. § 1983. Thus, under *Jones*, Plaintiffs' state constitutional damages claims are barred. *See Curry v. Wayne County*, No. 216842, 2001 WL 765901 (Mich.App. Jan. 26, 2001) (affirming summary disposition of the plaintiff's constitutional claims against the county and its sheriff under *Jones* ).

### 3. Takings

■ In their complaint, Plaintiffs allege a violation of their "substantive due process [right] to be free from arbitrary or illegitimate governmental actions." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), however, precludes the use of substantive due process analysis when a more specific constitutional provision governs. Thus, the court construes Plaintiffs' substantive due process claim as a takings claim.

■ Further, Plaintiffs assert a violation of the Fourth Amendment's prohibition of unreasonable seizures, made applicable to the states through the Fourteenth Amendment. Such a claim may be coupled with a Fifth Amendment takings claim. *See Soldal v. Cook County*, 506 U.S. 56, 70, 113 S.Ct. 538, 121 L.Ed.2d 450

(1992). Just as is the case with the Fifth Amendment takings claim, in order to demonstrate a violation of the Fourth Amendment, Plaintiffs must first demonstrate a constitutionally protected property interest. *See United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (a seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property."). Once Plaintiffs show that the government meaningfully interfered with their possessory interest, they must then show that the seizure was objectively unreasonable. *See Thomas v. Cohen,* 304 F.3d 563, 574 (6th Cir.2002); *see also Fox v. Van Oosterum,* 987 F.Supp. 597, 608 (W.D.Mich.1997) ("[C]ourts have held that the wrongful retention of property may state a claim under the Fourth Amendment."). If Plaintiffs had a property right to the interest obtained from their overbid surpluses and the Defendants took those private funds for public use, the seizure would be objectively unreasonable. Accordingly, if Plaintiffs can demonstrate a property interest at stake and a violation of the Takings Clause, they can also prevail on a Fourth Amendment unreasonable seizure claim.

■ The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. This restraint on the power of the has also been made applicable to the states through the Fourteenth Amendment. *See Phillips v. Washington Legal Found.,* 524 U.S. 156, 163–64, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998). It is "designed to bar [the government] from forcing some peo-

ple alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (internal citations omitted). The Takings Clause protects, rather than creates, property interests. Thus, the existence of a property interest is determined by reference to "existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

### a. Existence of a Property Interest

■ Since the Michigan statute regarding foreclosure sales and payment of surplus proceeds, Mich. Comp. Laws § 600.3252, is silent with respect to the payment or retention of interest earned on the overbid surpluses, the court must look to Michigan common law to determine if a property right exists in this case. *See Grand Rapids Pub. Schs. v. City of Grand Rapids,* 146 Mich.App. 652, 381 N.W.2d 783, 785 (1986).[3] "In general, interest is merely an incident of the principal fund, making it the property of the party owning the principal fund." *Id.* at 786 (citing *Pontiac Sch. Dist. v. City of Pontiac,* 294 Mich. 708, 294 N.W. 141 (1940); *Univ. of South Carolina v. Elliott,* 248 S.C. 218, 149 S.E.2d 433 (1966)). Thus, the common law rule that "interest follows principal" applies in Michigan. *Star–Batt, Inc. v. City of Rochester Hills,* 251 Mich.App. 502, 650 N.W.2d 422, 426 (2002) ("Interest earned on a principal fund is the property of the party owning the fund.") This common

---

**3.** "[T]he Legislature is deemed to act with an understanding of common law in existence before the legislation was enacted." *Nation v. W.D.E. Elec. Co.,* 454 Mich. 489, 563 N.W.2d 233, 236 (1997). "[S]tatutes in derogation of the common law must be strictly construed, and will not be extended by implication to abrogate established rules of common law." *Rusinek v. Schultz, Snyder & Steele Lumber Co.,* 411 Mich. 502, 309 N.W.2d 163, 166 (1981) (citations omitted).

law rule applies when a municipality acts as a custodian of private funds under state or local law. *Id.* at 426–27.

 In this case, it is undisputed that the overbid surpluses generated from foreclosure sales in Wayne County are deposited into a general bank account administered by the Wayne County Treasurer. Defendants admit that interest is paid on the funds that are deposited in this account. (Defs.' Br. at 11 ("The interest rates on the pool account for each month of a 43 month period are listed in Exhibit B. The average rate for the period is 3.95%.").) Thus, this is not a situation where the funds failed to generate interest as a result of the County's decision to forgo investment or deposit into an interest bearing account. Upon being deposited into the pooled account, the overbid surplus funds began generating interest, thus contributing to the overall interest income realized by the County. The interest income is then used to offset the numerous banking fees incurred by the County.

Defendants argue that because "in the last few years (with the exception of one month), the pool account generated fees and costs far exceeding the amount of interest generated," no net interest or windfall to the county is generated, and thus Plaintiffs have no property right to claim. Conversely, Plaintiffs argue that "[t]he County took the[ ] private funds, commingled them with operational moneys, took the interest on the funds, and then used the pilfered interest for other purposes." (Pl.'s Reply at 2.) Plaintiffs assert that the interest earned on the overbid surpluses was far greater than the fees associated with such funds, and that the remaining interest should have been disbursed to the owners of the principals rather than appropriated by the County to pay for unrelated banking fees. (Pls.' Reply at 3 n. 2.) The court agrees with Plaintiffs. Assuming Plaintiffs can show that the fees attributable to the overbid surpluses were less than the interest generated by the surpluses, the court finds that Plaintiffs have a cognizable property interest in any such net interest.

It is unclear under Michigan law whether a government entity has a duty to invest private money when held by the government in a custodial capacity. *See Star–Batt, Inc.*, 650 N.W.2d at 424 n. 2 ("We express no opinion whether a city has any obligation to invest the cash bonds [belonging to private contractors and in the possession of the city], nor have we found any Michigan case law on this issue."). Nonetheless, once such money is invested and generates interest, the common law rule is clear that the interest must follow the principal. While the gross interest earned on private money can be adjusted downward, or negatively impacted, to account for the costs and fees associated with the generation of such interest (leading to the net interest earned on the money), it cannot be used to offset other fees or costs levied against the county, even if those unrelated costs are contained in the same bank account as the private money. *See id.* at 423 (holding that the interest retained by the city was the property of the private contractor that owned the principal and that "[h]ad the city desired to charge an administrative fee [to offset the costs incurred by the city in administering the fund] … it could have easily said so [in the ordinance], but the city did not.").

Just as the County cannot take private funds or the interest generated on those funds to pay for government expenses such as employee wages, the County may not commandeer the interest earned on the overbid surpluses to pay for unrelated banking costs incurred by the County. The fact that the unrelated fees happen to be for funds held, or transactions stem-

ming from, the same account in which the private surpluses are held is irrelevant. If net interest on the private funds has been generated, that interest must follow the principal. It cannot be diverted to pay for unrelated expenses of the County, even if the diversion occurs in relatively simple manner (i.e., within the County's pooled banking account). *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 168, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) ("[R]egardless of whether the owner of the principal has a constitutionally cognizable interest in the *anticipated* generation of interest by his funds, any interest that does accrue attaches as a property right incident to the ownership of the underlying principal."). Once the County retains the net interest a taking has occurred. How the County may decide to spend the interest after the fact, whether it is banking fees or County construction projects, is irrelevant. *See Webb's Fabulous Pharm., Inc. v. Beckwith*, 449 U.S. 155, 164, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing the Taking Clause of the Fifth Amendment was meant to prevent. That Clause stands as a shield against arbitrary use of government power.").

If the court were to accept Defendants' position, the County could always avoid paying interest rightfully owned by private individuals by commingling the private funds it holds in the same account as public money, so long as the entire pooled account did not generate net interest. Such commingling could be done intentionally to allow the County to lower their banking fees at the expense of private fund-holders or it could be an inadvertent result of complex bookkeeping. In any event, the result is the same: the interest earned on private money is used to pay for unrelated County expenses, rather than being paid along with the principal. The Fifth Amendment is designed to prohibit such a result. *See Penn Central Transp. Co.*, 438 U.S. at 123, 98 S.Ct. 2646 (The Takings Clause is "designed to bar [the government] from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."); *see also Webb's Fabulous Pharm., Inc.*, 449 U.S. at 163, 101 S.Ct. 446 (characterizing the county's retention of the interest as "a forced contribution to general governmental revenues, and ... not reasonably related to the costs of using the [government's services]").

The County's argument that it does not receive a "windfall" from the interest generated on the overbid surpluses is unpersuasive. Although the pooled account typically does not generate net interest income on the whole, the County may realize a gain from the interest earned on the private funds. Such gains, if they exist, are then used to lower the County's overall financial liability to the bank by decreasing the amount owed in fees. Thus, the county would be receiving a benefit at the expense of private individuals.

Further, if the county were permitted to retain the interest earned on private funds so long as those funds were pooled with other funds that generate substantial fees, incentives would exist for commingling private and public funds and for delaying the return of the private funds so that greater interest could be earned from them. *See Webb's Fabulous Pharm., Inc.*, 449 U.S. at 162, 101 S.Ct. 446 ("Indeed, if the county were entitled to interest, its officials would feel an inherent pressure and possess a natural inclination to defer distribution, for that interest return would be greater the longer the fund is held; there would be, therefore, a built-in disincentive against

distributing the principal to those entitled to it."). In this case, although it is likely an unintentional side effect of administering the public and private funds in one commingled account, the turnaround time for disbursement of overbid surpluses increased once they were placed into the pooled account. (Ben–Ami Dep. at 47–48.)

For the reasons stated above, the court finds that, if the interest earned on the overbid surpluses was greater than fees properly attributed to those surpluses, the resulting net interest is the property of the individual that owns the principal and that the County's retention of such interest, if it exists, without any compensation constitutes a taking in violation of the Fifth Amendment.

**b. Factual Analysis of Pooled Account**

 Having found that a property right to any interest generated on the overbid surpluses, less the banking fees and costs associated with those surpluses, exists and is cognizable under the Takings Clause, the court must examine whether any factual issues exist regarding the generation of positive interest income on the surpluses. If Plaintiffs can demonstrate that the factual evidence compels one reasonable conclusion—that the interest generated on the overbid surpluses is greater than the relevant fees and costs assessed against those funds—summary judgment is appropriate. Conversely, if Defendants can demonstrate that the fees attributable to the surpluses are indisputably greater than the interest earned from the surpluses (i.e., net interest is not earned on the private money), they must be granted summary judgment. Otherwise, a jury issue exists.

Defendants argue that "[t]he handling of the surplus funds is a dynamic process, that requires periodic banking activity," and because "the county is constantly depositing and disbursing surplus mortgage proceeds ... surplus fund activity will al-ways generate banking costs and service fees associated with its handling." (Defs.' Br. at 8.) Defendants claim, "it is more likely than not that such costs and fees will exceed any interest attributable to surplus funds." (*Id.*) Despite these assertions, Defendants simply provide the court with the records for the County Treasurer's pooled account showing that the pooled bank fees exceed net interest on that account. Without explanation, these record shed little, if any, light on the assertions made by Defendants—that the fees associated with the handling of the surpluses "more likely than not" exceed any interest attributable to such surpluses. Accordingly, Defendants have not demonstrated that they are entitled to summary judgment.

Plaintiffs, on the other hand, attempt to explain the bank statements in a footnote contained in their reply. Plaintiffs, who have the ultimate burden of proof, however, only explain the charges levied per check issued on the surplus funds. (Pls.' Reply at 3 n. 2.) Plaintiffs also set forth averages and an explanation of a single monthly statement (August 2000). There is no evidence regarding how many checks had to be deposited or issued in relation to Plaintiffs' surpluses and there is no explanation of general, account-wide, charges that may be attributable to the surpluses. Thus, a factual issue exists as to which fees can fairly be assessed on the surpluses and whether those fees are greater than the interest earned by the surpluses. Accordingly, Plaintiffs' cannot be granted summary judgment on their takings claim.

Thus, with respect to Plaintiffs' Fourth Amendment seizure claim, Fifth Amendment takings claim, and procedural due process claim (see section II.B.4. below), a factual issue exists as to whether a property interest (i.e., net interest attributable to the surplus funds) existed and as to the amount of any such interest.

## 4. Procedural Due Process Claim

■ "In considering procedural due process claims, [the court] first determine whether the interest at stake is within the Fourteenth Amendment's protection of liberty and property." *Ferencz v. Hairston*, 119 F.3d 1244, 1247 (6th Cir.1997). "Only after [the court has] concluded that the interest claimed is within the protection do we consider the form and nature of the process that is due." *Id.*

As discussed above, Plaintiffs may be able to demonstrate a protected property interest at stake in this case (i.e., the interest from the overbid surpluses). Further, there is no indication that a pre-deprivation procedure exists to protect a person claiming the excess funds and interest after the foreclosure sale. An individual simply requests the overbid funds and is provided with a check for the principal, while the county retains any interest generated from the private money. Thus, the evidence is clear that Plaintiffs' property interest "was abridged without appropriate process." *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1108 (6th Cir.1995); *see also Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir.2001) ("Courts have long recognized that the Fourteenth Amendment requires that an individual who is deprived of an interest in liberty or property be given notice and a hearing.").

Defendants argue that Plaintiffs' procedural due process claim must fail under *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) because ade-quate post-deprivation remedies existed to protect Plaintiffs' property interests. Plaintiffs, however, correctly note that the *Parratt* decision—holding that post-deprivation procedures are adequate under the Constitution when unpredictable, random acts unauthorized by state law or procedure resulted in a deprivation of property—is inapplicable where the actions at issue are in accordance with established government procedure. *See Mertik v. Blalock*, 983 F.2d 1353, 1365 (6th Cir.1993) ("Cases in which a due process challenge is made to deprivations resulting from the enforcement of an established state procedure stand in sharp contrast to *Parratt* and *Hudson* cases. In such cases, the actions at issue are not random or unauthorized, and it is both practical and feasible for the state to provide pre-deprivation process to the aggrieved party. A § 1983 plaintiff making this type of claim need not plead or prove the inadequacy of state remedies."); *see also Thomas v. Cohen*, 304 F.3d 563, 578–80 (6th Cir.2002).[4] Here, the actions of the Defendants were not random and unauthorized, but in accordance with the county's procedure for managing the overbid surpluses and retaining the interest earned on such funds for the county's general fund. (*See* Ex. 5 attached to Ben–Ami Dep.) Thus, the court finds unpersuasive Defendants' argument that post-deprivation proceedings sufficed in this case. Accordingly, Defendants will be denied summary judgment on this claim. Inasmuch as a factual issue exists with respect to the actual existence of net

---

4. As the Sixth Circuit stated in *Tri–Corp Mgmt. Co. v. Praznik*, 33 Fed.Appx. 742, 746, 2002 WL 486241, *4 (6th Cir.2002),

In this Circuit, a plaintiff states a § 1983 procedural due process claim through one of two methods: "(1) [by] demonstrating that he is deprived of property as a result of established state procedure that itself violates due process rights; or (2) by proving that the defendants deprived him of proper-ty pursuant to a 'random and unauthorized act' *and* that available state remedies would not adequately compensate for the loss." *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir.1991) (emphasis in original) (quoting *Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir.1989)); *see also Mertik*, 983 F.2d at 1365.

*Id.*

interest earned on the overbid surpluses, Plaintiffs' motion for summary judgment will also be denied.

### 5. Equal Protection

■ In the complaint, Plaintiffs allege a violation of their "right under the Equal Protection Clause of the Fourteenth Amendment to be free from arbitrary or irrational treatment." (Compl.¶ 15.) Defendants argue that "the county had a legitimate interest in administrative efficiency and cash manageability when it deposited mortgage surplus funds in the pool account." (Defs.' Br. at 14.) Further, Defendants note that Plaintiffs have not alleged that they were treated differently than similarly situated persons based on a common group characteristic. *See Heller v. Doe by Doe,* 509 U.S. 312, 319–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (applying highly deferential rational basis standard to equal protection claim not involving fundamental rights or suspect class).

The court finds that no issue of material fact exists that would entitle Plaintiffs to relief on their equal protection claim. Plaintiffs have set forth no evidence indicating the class of persons that were subjected to differential treatment by the county. Further, the county's decision to pool their funds and to simply distribute checks in the amount of the principal (without calculating and adding interest to the disbursements) was rationally related to the county's legitimate interest in simplifying their management of funds and efficiently distributing private money without delay. Accordingly, Defendants' motion for summary judgment will be granted with respect to Plaintiffs' equal protection claim.

### 6. Immunity Against Federal Claims

#### a. Sovereign Immunity

■ With respect to all of Plaintiffs' federal claims, Defendants argue that they were acting pursuant to the state statutory scheme, "essentially as state agents," thus mandating dismissal of the § 1983 claim. (Defs.' Br. at 13–14.) "Whether a public employee is a state or county government official is a matter of federal law, informed by provisions of state law involving sheriffs." *Johnson v. Fink,* 1999 WL 33603131 (W.D.Ky. Sept. 17, 1999) (citing *Brotherton v. Cleveland,* 173 F.3d 552, 560 (6th Cir. 1999)). The Sixth Circuit has looked at several factors to determine whether a local government and its officials acted as arms of the state, and are thus entitled to sovereign immunity from § 1983 claims. *Brotherton,* 173 F.3d at 560. These factors include: "how state law defines the entity, what degree of control the state maintains over the entity, where funds for the entity are derived, and who is responsible for judgment against the entity." *Id.* (citing *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.,* 734 F.2d 730, 732 (11th Cir.1984)). The most important factor is whether the county or the state would be financially liable for any judgment that could result from the suit. *See Alkire v. Irving,* 330 F.3d 802, 812 (6th Cir.2003).

■ Analyzing the above factors, the court finds that the County, including its Treasurer and Sheriff, acted as a local government in this case rather than an arm of the state. First, under the Michigan Constitution, the Sheriff and Treasurer are treated as elected officials for the county. *See* Mich. Const. Art. 7 § 4. Further, the Sheriff and Treasurer are to hold their principal offices in the county seat. *See* Mich. Const. Art. 7 § 5. Thus, Michigan law clearly contemplates that the county Sheriff and Treasurer are to be treated as local, rather than state, officials. Second, there is no evidence that the state maintained control over the Sheriff or Treasurer. Although the foreclosure sales are governed by state law, the Sheriff and

Treasurer still can act autonomously under the law, just as any other local official that is bound and/or guided by state law. Further, as discussed above, state law is silent with respect to the interest earned on overbid surpluses. Thus, the county officials were not required by the statute to retain the interest. Third, the county pays the salary of the Sheriff and Treasurer from the county treasury. *See* Mich. Comp. Laws § 45.401(1) (sheriff); § 45.41 (treasurer). Finally, and most importantly, the county will presumably bear financial responsibility for any judgment that may result in this case.

Inasmuch as the above factors weigh against treating the County or its officials as arms of the state, Defendants will not be granted sovereign immunity.

### b. Section 1983 Liability

■ Next, Defendants argue that "there is no evidence in this case that any [county officials with final authority to establish municipal policy] ordered or directed that surplus funds be deposited into the interest bearing pool account at issue." (Defs.' Br. at 15.) The Supreme Court has held:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law. However, like other governmental entities, municipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

In this case, a decision was made in June 1999 to place the overbid surpluses in the general county bank account. A memorandum sent from Wayne County's Director of Cash Management to the Office of the County Treasurer states the following:

> Personnel of the Department of Management and Budget, the office of the County Sheriff, and the office of the County Treasurer have been in discussion regarding the integration of the Sheriff Court Services Division's cash into the County general ledger system.

(Ex. 5 attached to Ben–Ami Dep.) The memorandum also stated, "Please note that any interest accruing to [the Sheriff's receiving account] is to accrue to the General Fund." (*Id.*)

It is evident from the memorandum that the decision to pool the funds and retain any interest earned on those funds was made by the appropriate decision makers from a cross-section of county departments. *See Rushing v. Wayne County*, 436 Mich. 247, 462 N.W.2d 23, 29 (1990) (holding that, as a matter of law, the policies of the sheriff's department and jail

administrators were attributable to the county). Further, the treasurer issued checks in accordance with this policy, with payment of only the principal and retention of the interest. This is not a case in which Plaintiffs are attempting to assert § 1983 liability against the local government for the actions of a tortfeasor employee. *See Monell,* 436 U.S. at 691–92, 98 S.Ct. 2018. Accordingly, the court finds that the County can be held liable under § 1983.

### c. Qualified Immunity Individual Defendants

■ Generally, government officials performing discretionary functions are shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

> [The Sixth Circuit] court evaluates qualified immunity claims using a three-part inquiry. First, [the court] determine[s] whether the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003). Second, [the court] determine[s] whether the right that was violated was a clearly established right of which a reasonable person would have known. *Id.* Finally, [the court] determine[s] whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Id.; Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999).

*Toms v. Taft,* 338 F.3d 519, 524 (6th Cir. 2003).

First, as discussed above, when the court views the facts in the light most favorable to Plaintiffs, a constitutional violation is present. However, although the common law rule that "interest follows principal" was well established at the time of the alleged taking, *see Phillips,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174; *Grand Rapids Pub. Schs.,* 146 Mich.App. 652, 381 N.W.2d 783, the contours of that property right were not sufficiently clear so that the Treasurer and the Sheriff should have realized they were abridging that right by not remitting the interest to the principal-holder when the county's account, on the whole, was not generating interest. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (for the right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). The right must be established in a particularized, relevant sense. *See Toms,* 338 F.3d 519, 524. Based on the circumstances of this case, where the interest is absorbed by other fees in a pooled bank account, the right to the interest earned on the principal was not clearly established so that a reasonable County official would know they were violating the Constitution by failing to pay over the interest.

Accordingly, Plaintiffs' § 1983 claims against the County Treasurer and Sheriff, *in their individual capacities,* are defective as a matter of law and must be dismissed.[5] Inasmuch as Plaintiffs are suing the Treasurer and Sheriff in their official capacities, the § 1983 claims that remain viable against the county also remain with respect to the Treasurer and Sheriff.

---

**5.** Plaintiffs admitted that they "have little interest in the personal capacity aspect of the lawsuit—those are covered by the County for

any judgment. The issue is of no practical significance." (Pls.' Reply at 4.)

## III. CLASS ACTION CERTIFICATION

In light of the above findings, the court finds that further briefing and/or evidentiary hearings are warranted before the court considers the question of class certification. Such a course will ensure that the issue of whether a property right, and hence constitutional claim(s), exists is fully considered prior to certification of a class and expenditure of party and court resources.

As stated above, a question of fact exists with respect to whether a property right existed in this case (i.e., whether the interest earned on the private overbid surpluses was greater than the fees from the account fairly attributable to such surpluses). It seems to the court that the determination of this factual issue depends upon nothing more than an examination of the relevant accounts and that the court should be able to rule, as a matter of law, as to whether constitutional violations have occurred. Only if the answer to that question is "yes" should Plaintiff succeed in a summary judgment motion, and the case should then proceed as a class action to resolve the calculative inquiry for each class member.

To this end, the court will permit additional limited discovery in this case to inquire into the interest earned and fees subtracted from the relevant pooled account. Further, the court will require additional briefing to determine if a property right exists upon which Plaintiffs can base their constitutional claims. Thus, unless the parties can stipulate to the interest and fees attributable to the overbid surpluses, the briefing should focus on the bank statements, with explanations as to the relevant interest earned and fees assessed. If, after reviewing such briefs, the court determines that an evidentiary hearing would assist in this matter, the parties

will be notified. Accordingly, the Plaintiff's motion for class certification will be held in abeyance while the court considers such briefing.

## IV. CONCLUSION

IT IS ORDERED that Plaintiffs' "Motion for Summary Judgment" is DENIED.

IT IS FURTHER ORDERED that Defendants' "Cross–Motion for Dismissal and/or Summary Judgment" is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to Plaintiffs' state constitutional and tort claims, equal protection claim, and all federal claims asserted against Wayne County's Treasurer and Sheriff, in their individual capacities.

Defendants' Motion for Dismissal and/or Summary Judgment is DENIED, and this case shall proceed, with respect to Plaintiffs':

1) Fifth Amendment takings claim,
2) Fourth Amendment unlawful seizure claim, and
3) procedural due process claim.

IT IS FURTHER ORDERED that Plaintiffs' "Motion for Class Certification" is held in ABEYANCE.

IT IS FURTHER ORDERED that additional limited discovery take place to fully explore the interest earned and fees charged in the County's pooled bank account. Such discovery must be completed on or before **October 31, 2003**.

IT IS FURTHER ORDERED that the parties submit additional briefing, as discussed in Section III above. Plaintiffs shall submit a brief explaining the relevant interest and fees on or before **November 14, 2003**. Defendants may respond on or before November 28, 2003. Unless otherwise ordered, a reply shall not be filed.